

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 04 CR 1023-2, 8, 15 |
| | ) | |
| MIGUEL AYALA, LUIS GONZALEZ, and | ) | Judge John W. Darrah |
| EDWIN PEREZ | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

### BACKGROUND

A federal grand jury returned a nineteen-count indictment charging eighteen Defendants with various crimes. Count One of the indictment charged all Defendants in a conspiracy to distribute and possess with intent to distribute crack cocaine. Other charges included possession of a firearm by a convicted felon, possession of a firearm in furtherance of a drug trafficking crime, use of a communication facility in committing and in causing and facilitating the commission of a felony, and possession with intent to distribute a controlled substance.

On September 19, 2006, Defendant Edwin Perez ("Defendant Perez") pled guilty to Count 1 of the indictment pursuant to a plea agreement that includes the Government's assertion that Perez's offense involved at least 150 grams of cocaine base but less than 500 grams of cocaine base in the form of crack cocaine.

On September 21, 2006, Defendant Luis Gonzalez ("Defendant Gonzalez") pled guilty to Count 1 of the indictment pursuant to a plea agreement that includes the Government's assertion that Gonzalez's offense involved at least 50 grams of cocaine base but less than 500 grams of cocaine base in the form of crack cocaine.

On September 22, 2006, Defendant Miguel Ayala ("Defendant Ayala") pled guilty to Count 1 of the indictment pursuant to a plea agreement that includes the Government's assertion that Defendant Ayala's offense involved at least 150 grams of cocaine base but less than 500 grams of cocaine base in the form of crack cocaine.

All three Defendants dispute the amount and nature of the controlled substance as crack cocaine, and the plea agreements reserve to each Defendant the right to require the Government to prove the nature and amount of the controlled substance as crack cocaine.

## LEGAL STANDARD

*Sentencing Factors*

The government bears the burden to prove the facts supporting a sentence by a preponderance of the evidence. *USA v. Noble*, 246 F.3d 946, 951 (7th Cir. 2001). In drug conspiracy cases, "a sentencing court must consider as relevant conduct all 'types and quantities of drugs that were part of the same course of conduct or common scheme or plan . . . .'" *United States v. Hollins*, 498 F.3d 622, 629 (7th Cir. 2007) (*Hollins*) (quoting *United states v. McEntire*, 153 F.3d 424, 435 (7th Cir. 1998)) (internal quotations and citations omitted). "The Government's burden in attributing drug quantities to a particular defendant does not require that it show that the defendant is involved in or even have direct knowledge of a particular transaction; 'reasonable foreseeability refers to the scope of the agreement that a defendant entered into when he joined the conspiracy, not merely to the drugs

he may have known about.'" *Hollins*, 498 F.3d at 630 (quoting *United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir. 1993)). If any factor that is important to a sentencing determination is reasonably disputed:

> the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support probable accuracy.

U.S.S.G. § 6A1.3(a).

### *Cocaine Base vs. Crack Cocaine*

The Sentencing Guidelines define "crack" as "the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy rocklike form." U.S.S.G. § 2D1.1(c), Note (D).

Cocaine, in its naturally occurring form, is a base with the chemical formula $C_{17}H_{21}NO_4$. In the pure form, the terms "cocaine" and "cocaine base" are synonymous, both referring to the substance with the chemical formula $C_{17}H_{21}NO_4$. *See United States v. Booker*, 70 F.3d 488, 490 (7th Cir. 1995) (*Booker*). Because cocaine is rarely used in its naturally occurring form in the United States, before it is imported, it is usually converted into cocaine hydrochloride, commonly known as powder cocaine. The chemical formula for cocaine hydrochloride is $C_{17}H_{22}ClNO_4$. *See Booker*, 70 F.3d at 490-91.

Converting cocaine base to cocaine hydrochloride involves first converting coca leaves into coca paste by mixing the coca leaves with an alkaline material (*e.g.*, sodium bicarbonate), an organic solvent (*e.g.*, kerosene), and water. The resulting coca paste is then dissolved in hydrochloric acid

and water. The hydrochloric acid combines with the cocaine to produce a salt – cocaine hydrochloride (powder cocaine). The powder cocaine can be ingested, insufflated (snorted) or injected. However, the cocaine powder is not smokable because it decomposes at approximately the same temperature at which it vaporizes. *See Booker*, 70 F.3d at 490-91.

Cocaine hydrochloride may be converted into "freebase cocaine," which essentially means that the base (cocaine) is freed from the hydrochloride and converted into the same chemical state it was before it became a salt. Cocaine freebase can be manufactured in different ways. In the 1970s, cocaine freebase was generally made by dissolving cocaine in ammonia and adding an organic solvent, usually ether. This process is dangerous to both the manufacturer and end user due to the flammability of ether. *See Booker*, 70 F.3d at 491.

A safer method for manufacturing freebase cocaine was developed and involves dissolving cocaine hydrochloride in water and baking soda, boiling the mixture until only a solid substance remains, and allowing the substance to dry. This resulting cocaine is commonly known as "crack" and the methodology is generally known as the "crack method." *See Booker*, 70 F.3d at 491; *United States v. Edwards*, 397 F.3d 570, 572 (7th Cir. 2005) (*Edwards*). Crack, because it is smokable (contrary to powder cocaine), is more potent than powder cocaine and "rivals freebase cocaine in terms of its potency while avoiding the hazards of freebasing, which requires the use of flammable ether." *Edwards*, 397 F.3d at 574.

The federal Sentencing Guidelines provide for increased penalties, in the form of heightened base offense levels, for crimes involving "cocaine base." *See* U.S.S.G. § 2D1.1(c). Prior to the Sentencing Commission's November 1, 2007 amendment to Section 2D1.1(c), 100 times more powder cocaine than "cocaine base" was required to trigger the same mandatory minimum penalty

for a crack cocaine offense. Effective November 1, 2007, Amendment 706 to the Sentencing Guidelines reduced the commonly referred to "100-to-1 drug quantity ration." *See* U.S.S.G. Amendment 706 (as amended by Amendment 711), made retroactive, effective March 3, 2008. While reduced, enhanced penalties for crimes involving "cocaine base" remain.

Furthermore, "for purposes of the enhanced penalties in the Guidelines *and* the statutes 'cocaine base' means 'crack cocaine.'" *Edwards*, 397 F.3d at 572 (citing *Booker*, 70 F.3d at 489-90). This construction is consistent with the "overriding Congressional concern" to provide for harsher penalties due to the alarming rise in the use of crack associated with the easier and "safer" means of using sodium bicarbonate to manufacture crack cocaine (the "crack method"). *See Booker*, 70 F.3d at 491-94; *Edwards*, 397 F.3d at 573-75.

Although the Sentencing Guidelines provide that "crack" is *usually* prepared by processing cocaine hydrochloride with sodium bicarbonate, it is "not mandate[d] that a substance must contain those ingredients to be crack." *United States v. Lake*, 500 F.3d 629, 634 (7th Cir. 2007) (*Lake*). Other evidence may sufficiently demonstrate that the substance involved in the commission of the crime was crack cocaine. For example, in *Lake*, a forensic scientist's testimony that the "white rocky substance" found in Lake's bedroom that tested positive for cocaine base but did not contain sodium bicarbonate, along with a Drug Enforcement Administration ("DEA") Agent's testimony that the drug found in the bedroom was crack cocaine and a self-described "crack-head's" testimony that Lake provided him crack "from time to time" was sufficient to prove the substance was crack cocaine. *See Lake*, 500 F.3d at 632, 634; *see also United States v. Kelly*, ___ F.3d ___, ___ (7th Cir. 2008) 2008 WL 623779 (7th Cir. March 10, 2008) (government sufficiently proved cocaine base that tested negative for the presence of sodium bicarbonate was crack through testimony of forensic

5

chemist, appearance of the drug, and manner of packaging); *United States v. Buchanan*, 362 F.3d 411, 413 (7th Cir. 2004) (testimony of forensic chemist, which did not include testimony regarding the presence or lack thereof of sodium bicarbonate, and veteran police officer sufficient to prove substance was crack cocaine).

## EVIDENTIARY HEARING

*The Government's Evidence*

An evidentiary hearing was held January 22-24, 2008, on the issues of the nature and amount of the controlled substance as to each Defendant. The Government presented an expert witness, Andrew Benson, a forensic chemist for the DEA. He tested two different substances, identified as Government's Exhibits 17 and 18, for the presence of a controlled substance. Each exhibit contained cocaine base and the adulterant[1] Diltiazem. The net weight of Exhibit 17 was 0.26 grams, and the net weight of Exhibit 18 was 5.4 grams. Benson's observation notes for Exhibit 18 describe the substance as a beige lumpy substance with small bits of plant material. This description was verified by another chemist in the lab. Cocaine base in its dryest form is a rocky, lumpy, off-white, beige-colored substance.

Benson's tests included a color test, which indicated positive for the possible presence of cocaine in the form of cocaine base. Benson then conducted a gas chromatography, mass spectrometry test ("GCMS). The GCMS is a confirmatory test. The GCMS test indicates the presence of cocaine but cannot determine whether cocaine powder or cocaine base is present. As to Government's Exhibits 17 and 18, the GCMS indicated the presence of cocaine.

---

[1] An adulterant is used to "cut" or "spread out the drug more."

Benson then performed infrared spectroscopy ("IR") on the two exhibits. The IR indicated cocaine base was present in both exhibits. Benson then conducted an ether extraction, which also indicated the presence of cocaine base. Benson had not tested either exhibit for sodium bicarbonate because he was not asked to do so.

Benson further testified that if cocaine hydrochloride (cocaine powder) was reduced to cocaine base by using sodium bicarbonate, the resulting cocaine base may or may not test positive for the presence of sodium bicarbonate because all of the sodium bicarbonate may have been consumed in the process or the excess sodium bicarbonate may have been washed out. Even if sodium bicarbonate is found in a sample, Benson could not testify with any degree of scientific certainty that the sodium bicarbonate residue was the result of a process that used sodium bicarbonate.

Gerald Skowronski, a senior forensic chemist for the DEA, performed a battery of five tests on a substance identified as Government's Exhibit 16 to determine if the exhibit contained a controlled substance: a cobalt thiocynate screening color test, a ferric chloride color test, a GCMS exam, an IR test, and a gas chromatography ("GC") test. Based on these tests, Skowronski concluded that Government's Exhibit 16 contained cocaine base. The net weight of Exhibit 16 was 28.2 grams, and the purity of cocaine base was 51 percent.

Skowronski also conducted a series of three tests on Government's Exhibits 16, 17 and 18 for the presence of sodium bicarbonate. These tests included: an IR test, an urinal acetate crystal test, and an insolubility test. Based on these tests, Skowronski concluded that Government's Exhibits 16 and 18 contained sodium bicarbonate.

7

Skowronski testified that "crack" is a street term and not a scientific term. An individual cannot look at cocaine base and determine what method was used to convert the cocaine salt to cocaine base. The presence of sodium bicarbonate also does not indicate when the sodium bicarbonate was added. A sample of cocaine base that tests positive for the presence of sodium bicarbonate only indicates the presence of the compound: the sodium bicarbonate may have been used to convert the cocaine salt to cocaine base, or it may have been added directly to cocaine base as an adulterant. Skowronski has seen sodium bicarbonate used as an adulterant but "very rarely, very, very rarely." Further, if sodium bicarbonate was used to convert cocaine salt to cocaine base, the resulting cocaine base may or may not test positive for sodium bicarbonate because it is possible to wash out any excess sodium bicarbonate and/or all of the sodium bicarbonate was used in the process.

Richard Perez ("Richard"), a co-defendant in this case, also testified for the Government. Richard previously pled guilty to conspiracy to distribute crack cocaine in this matter. Richard became a member of the Maniac Latin Disciples street gang in 1995. From 2001 to approximately the summer of 2004, Richard held the position of Governor of the Cortez and Washtenaw section of the gang. As a Governor, Richard was involved in the distribution of nation packs to other gang members. Nation packs contained ten pieces of crack cocaine. The total weight of the each nation pack was approximately 1.5 grams. Gang members were expected to sell the crack cocaine and return the money to the gang. Richard distributed the nation packs at meetings three to four times a month. The nation packs contained marijuana instead of crack cocaine, "on a scale of one to ten, probably like three times." The number of people to whom Richard distributed nation packs at the meetings ranged from 6 to 25 people.

Richard testified that Defendant Perez was also a member of the Maniac Latin Disciples street gang. Richard first met Defendant Perez in 2002. Defendant Perez became the Governor of Cortez and Washtenaw in the summer of 2004, when Richard became the chief enforcer. Shortly after Richard met Defendant Perez, Defendant Perez offered to sell Richard 4.5 ounces of crack cocaine. Richard did not purchase the crack cocaine from Defendant Perez at that time but did, later, purchase crack cocaine from Defendant Perez. Richard also observed Defendant Perez's distributing crack cocaine, including rocks, sixteenths, and eightballs.[2]

At some point, Defendant Perez was incarcerated and later returned in the summer of 2004. After his return, Defendant Perez sold Richard crack cocaine on three different occasions. In approximately June 2004, Richard purchased 4.5 ounces of crack cocaine from Defendant Perez. Richard recalls the transaction because the drug was wet and he complained to Defendant Perez. The wet drug had a "rough smell," and Richard dried it using a fan. Richard sold the drug as crack cocaine and did not receive any complaints about the quality of the crack cocaine. Approximately five or six days later, Richard purchased another 4.5 ounces of crack cocaine from Defendant Perez. Richard recalls the transaction because Defendant Perez reimbursed Richard three eightballs for the previous drugs' being wet. Richard sold the drugs as crack cocaine and did not receive any complaints about the quality of the crack cocaine. Approximately a week later, Defendant Perez offered Richard 6.5 ounces of crack cocaine. Richard purchased the 6.5 ounces and recalls the sale

---

[2] A "sixteenth" is approximately 1.6 grams of crack cocaine and an "eightball is 3.5 grams of crack cocaine.

because, in front of Defendant Perez's house, police officers took the money with which Richard planned to use to purchase the crack cocaine. Defendant Perez gave Richard the crack cocaine without the money upfront.

Richard also testified that Defendant Ayala is a member of the Maniac Latin Disciples street gang. Richard participated in a theft of a kilogram of powder cocaine with Defendant Ayala in late February or early March 2004. Defendant Ayala gave 9.0 ounces of the powder cocaine to another gang member and used some of it to prepare powder cocaine into crack cocaine for Richard at Richard's home. Richard obtained 4.5 ounces of crack cocaine from the preparation. Richard was with Defendant Ayala almost daily, and he heard him telling others that he was selling sixteenths and eightballs of crack cocaine. Defendant Ayala was present "almost always" when Richard distributed the nation packs.

Richard testified that Defendant Gonzalez was also a member of the Maniac Latin Disciples street gang. Richard supplied Defendant Gonzalez with crack cocaine from 2003 until the summer of 2004. Richard supplied Defendant Gonzalez with two to three eightballs of crack cocaine a week. Defendant Gonzalez was present when Richard distributed the nation packs.

Richard testified that there was not a market within the Maniac Latin Disciples street gang for powder cocaine. When gang members spoke about selling cocaine, they were always referring to crack cocaine.

On cross-examination, Richard testified that, pursuant to his plea agreement, he was receiving one-third off his sentence for his cooperation. He testified that, at some point, Richard tried to "go around" co-defendant Wayne Spinato and purchase drugs directly from another individual identified as Prietito. In his December 1, 2004 statement to agents, Richard stated that

his crack cocaine supplier was Spinato and that he purchased crack cocaine from Defendant Perez "once." Prietito was the supplier to both Defendant Perez and Spinato.

Federal Bureau of Investigation Special Agent Christopher Weismantel was the team leader in the arrest of Defendant Ayala on December 1, 2004. Agent Weismantel and Special Agent Bernazoni interviewed Defendant Ayala on that same day. Defendant Ayala refused to sign an Advice of Rights form but indicated he wanted to speak with the agents without his attorney present. During the interview, Agent Weismantel was aware of the difference between crack cocaine and powder cocaine in the Federal Sentencing Guidelines and was careful to distinguish between the two during the interview.

Defendant Ayala initially denied being involved in the sale of crack cocaine. After being allowed to speak with Richard, who told him to cooperate, Defendant Ayala provided detailed information about his dealings in crack cocaine. Defendant Ayala stated that between the summer of 2003 and 2004, he has assisted Richard in obtaining and packaging crack cocaine for subsequent sale to end users. Defendant Ayala stated that he and Richard would purchase one and two ounce quantities of crack cocaine and brake them down for later sales. Defendant Ayala stated that he and Richard attempted to cook powder cocaine into crack cocaine on two occasions; however, they were unsuccessful. Defendant Ayala stated that they used a pot, water, powder cocaine, and baking soda in their attempts to cook the powder cocaine.

Defendant Ayala stated that he purchased one-half ounce of crack cocaine from Richard for a later sale. Defendant Ayala also distributed Richard's crack cocaine to Defendant Gonzalez that Defendant Gonzalez would later sell. The quantities given to Defendant Gonzalez ranged from a sixteenth of an ounce to an eighth of an ounce of crack cocaine.

11

Defendant Ayala observed Defendant Perez selling crack cocaine on behalf of Richard on several occasions during the summer of 2004. The quantities of the crack cocaine were sixteenths of an ounce.

Defendant Ayala acknowledged that crack cocaine was recovered from his home. Defendant Ayala stated that the crack cocaine in his home was essentially an insurance policy in case he needed money.

FBI Special Agent James McDonald investigates gang-related crimes in the Chicagoland area. Agent McDonald was involved in the arrest of Defendant Perez on December 1, 2004. Agent McDonald and Agent Garret Kruhn interviewed Defendant Perez after his arrest. During the interview, Agent McDonald did not observe anything to suggest that Defendant Perez was under the influence of alcohol or a controlled substance. During the course of the interview, Agent McDonald prepared a written statement based on Defendant Perez's statements. Agent McDonald was aware of the difference in the Federal Sentencing Guidelines between crack cocaine and powder cocaine and, based on this knowledge, distinguished between the two when he spoke with Defendant Perez.

In the statement prepared by Agent McDonald, and signed by Defendant Perez, Defendant Perez admitted that he was a member of the Maniac Latin Disciples and that, starting April or May 2004, he bought crack cocaine and powder cocaine from "Santos" approximately once a month in nine-ounce quantities. Prior to being supplied with crack cocaine from Santos, Defendant Perez purchased 4.5 ounces of crack cocaine from "Preto" about once a month for three or four months. Defendant Perez would also "play middle man" for Richard to purchase crack cocaine from Santos and Preto.

FBI Special Agent Mailin Chuy-Horn testified that Government's Exhibit 16 was recovered from Defendant Ayala's residence and that Government's Exhibits 17 and 18 were recovered from Defendant Perez's residence.

Agent Chuy-Horn interviewed Defendant Gonzalez after his arrest on December 1, 2004. Defendant Gonzalez signed an acknowledgment of advice of rights prior to giving his statement. During his statement, Defendant Gonzalez admitted that he was a Maniac Latin Disciple and that he sold crack cocaine in addition to marijuana. He purchased eightballs and sixteenths from different gang members and other gangs between 1999 and 2000. Defendant Gonzalez stated that Defendant Perez was selling eightballs and half-ounces of powder cocaine. Defendant Gonzalez was incarcerated from September 2003 to March 2004, after which time he went to Ohio until May 2004. After listening to some of the recorded telephone conversations, Defendant Gonzalez admitted that he was involved in dealing in crack cocaine and that he bought an eightball on one occasion and a sixteenth on another occasion.

The Government also moved for the admission of several transcripts of previously recorded telephone conversations that were obtained pursuant to court authorization. In a May 22, 2004 telephone call that co-defendant Fidel Hernandez made to Defendant Ayala, Hernandez states, "Listen, I need, uh, I need'a do some business wit' you, right?" Later in the same conversation, when Hernandez and Defendant Ayala are discussing a transaction, Defendant Ayala states, "It, it's not the thing that takes, it's the drying process that takes a while."

In a June 20, 2004 telephone conversation between Richard and Defendant Perez, Richard complain to Defendant Perez that the "shit" he gave him was "wet." Richard continues that he "bagged up, nineteen big ones" and gave another person an "O"[3] Richard then complains to Defendant Perez that Richard is "missing three . . . big ones." Richard further states that he gave "Titi" (Defendant Gonzalez) "three" of the nineteen "big ones." Later, in the same conversation, Richard and Defendant Perez discuss that the shortage may have resulted from "water."

In a June 23, 2004 telephone conversation between Richard and Defendant Perez, Defendant Perez states that he is "gonna get up with him today"; and Richard sates that he "want[s] it the other way, you know what I'm saying?" Defendant Perez states "O.K."; and when Richard asks "What is gonna bring me," Defendant Perez states a "six and a half."

In a June 23, 2004 conversation between Richard and Defendant Perez, Richard complains that Defendant Perez "grabbed six and a half that he was going to give me." Defendant Perez responds that he "already got rid of half of that shit now."

In a June 25, 2004 telephone conversation between Richard and Defendant Perez, Richard complains that "this shit is (unintelligible) super wet, bro." Defendant Perez tells Richard to "just put the fan on it . . . ."

*The Defendants' Evidence*

The Defendants presented Wayne A Morris, the owner and operator of Morris-Kopec Forensics; Morris testified as Defendants' expert witness. Morris's opinions were based on reviewing the DEA reports and analytical data – Morris did not conduct any testing.

---

[3]Referring to an ounce.

Morris opined that the accuracy of the DEA's chemical analysis of Government's Exhibit 16 for sodium bicarbonate was a "bad call. At best, it's extremely weak, but there are too many differences [in the IR] to make that call [for the presence of sodium bicarbonate]." Morris opined that it was possible that the substance of Government's Exhibit 16 may not be cocaine but a similar-looking substance that tested positive for cocaine "due to a thin film of material transferred from the use of plastic bags to outer surfaces." Morris admitted that it was possible to have no residual sodium bicarbonate if cocaine hydrochloride was reduced to cocaine base by the sodium bicarbonate method if the ratio was exact or if too little sodium bicarbonate was used.

Morris testified on cross-examination that the fact that the substance of Government's Exhibit 16 tested as cocaine base of 51 percent purity did not render his opinion unlikely or alter his opinion. Morris testified that the presence of sodium bicarbonate in cocaine base did not support an inference that the cocaine base was obtained by using sodium bicarbonate.

## DECISION

### *Type of Controlled Substance*

The Government proved by a preponderance of the evidence that the controlled substance involved in the drug conspiracy was cocaine base and that the cocaine base was crack cocaine. The Government's forensic chemists' testimony was credible and persuasive. The laboratory tests demonstrated that the controlled substance was cocaine base and that at least two of the recovered controlled substances tested positive for the presence of sodium bicarbonate. The presence of sodium bicarbonate, while not determinative, supports the inference that the cocaine base was reduced to crack cocaine using sodium bicarbonate (the "crack method"). This inference is further strengthened by the Defendants' statements in which they affirmatively stated they were involved

in the manufacture and distribution of crack cocaine. Moreover, the recovered controlled substance was also described as a beige lumpy substance, consistent with the usual description of crack cocaine. Morris's opinions as to the reliability of the Government's forensic chemists' analyses were not supported, and his testimony was not credible or persuasive.

Furthermore, as discussed above, the Defendants admitted in their statements after their arrest that they possessed and distributed crack cocaine. Co-defendant Richard's statement after his arrest and his testimony at the evidentiary hearing also demonstrate that the Defendants were selling crack cocaine. This was corroborated by the Defendants' statements after their arrest and the recorded telephone conversations.

In sum, the Government proved by a preponderance of the evidence that the controlled substance involved in the drug conspiracy was crack cocaine; and the Defendants failed to present any evidence that the controlled substance was not crack cocaine. [4]

*Quantity of Controlled Substance - Defendant Perez*

Richard testified to three transactions in approximately June 2004 in which Defendant Perez sold Richard a total of 15.5 ounces of crack cocaine – two transactions of 4.5 ounces and one transaction of 6.5 ounces. Richard's testimony was supported by Defendant Perez's own statement after his arrest. Defendant Perez also states in his June 24, 2004 telephone conversation that he

---

[4] Defendant Perez also argues that Section 841(b) is unconstitutional because it is void for vagueness. The Seventh Circuit has "already determined that Section 841(b) is not unconstitutional." *United States v. Martin*, 287 F.3d 609, 615-16 (7th Cir. 2002); *see also United States v. Collins*, 272 F.3d 984, 988-89 (7th Cir. 2001).

purchased another 6.5 ounces of crack cocaine that he did not sell to Richard. Based on this evidence, the total quantity of crack cocaine attributable to Defendant Perez is 622.6 grams (22 ounces X 28.3 grams/ounce).

*Quantity of Controlled Substance - Defendant Gonzalez*

Richard testified that he provided Defendant Gonzalez with 1/8 ounce quantities of crack cocaine two to three times a week in the summer of 2004. This testimony is corroborated by the June 20, 2004 telephone conversation in which Richard states that Defendant Gonzalez received "three big ones," as well as Defendant Gonzalez's statements after his arrest. Richard also testified that Defendant Gonzalez was present when Richard distributed nation packs. Defendant Gonzalez was not purchasing or selling crack cocaine while he was incarcerated or in Ohio from September 2003 through May 2004.

The above evidence supports a finding that the total quantity of crack cocaine attributed to Defendant Gonzalez is 84.9 grams, based on the receipt of two 1/8-ounce quantities of crack cocaine per week over a twelve-week (June 2004 - August 2004) period (2 X 1/8 ounces/week X 28.3 grams/ounce X 12 weeks).

*Quantity of Controlled Substance - Defendant Ayala*

The Government recovered 28.2 grams of crack cocaine from Defendant Ayala's residence. In addition, Richard testified that he and Defendant Ayala prepared 4.5 ounces of crack cocaine and that Defendant Ayala was present when Richard would distribute nation packs. Defendant Ayala also admitted in his statement after his arrest that he and Richard "cooked" powder cocaine into crack cocaine.

17

Based on the above evidence, the quantity of crack cocaine attributable to Defendant Ayala is 155.1 grams, based on the crack cocaine recovered at his residence and the 4.5 ounces prepared with Richard (28.2 grams + 4.5 ounces X 28.2 grams/ounce).

Dated: April 18, 2008

JOHN W. DARRAH
United States District Court Judge